## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TYREE RONELL MORRIS,

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

CASE NO. 2:14-cv-14406

DISTRICT JUDGE ARTHUR J. TARNOW
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Morris's Motion for Summary Judgment (Doc. 12) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 13) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34 and Supplemental Security Income ("SSI"). (Doc. 3; Tr. 123, 146). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 13).

Plaintiff Tyree Morris ("Morris")[1] was thirty-three years old when he protectively applied for benefits on April 18, 2012, alleging that he became disabled on May 15, 2011. (Tr. 123, 156). This application was denied on July 17, 2012. (Tr. 70). Morris requested a hearing before an Administrative Law Judge ("ALJ"), which took place on September 5, 2013 before ALJ Donald G. D'Amato. (Tr. 41-57). Morris, who was represented by attorney Katherine Fortune[2], testified, as did vocational expert ("VE") Michael Rosko. (Tr. 41). On October 3, 2013, the ALJ issued a written decision in which he found Morris not disabled. (Tr. 25-35). On September 13, 2014, the Appeals Council denied review. (Tr. 1-3). Morris filed for judicial review of the final decision on November 17, 2014. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v.*

---

[1] Morris is unrelated to the undersigned.
[2] On appeal, Morris is represented by attorney Howard D. Olinsky.

2

*Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

3

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Morris not disabled under the Act. The ALJ found at Step One that Morris had not engaged in substantial gainful activity since May 15, 2011, the alleged onset date. (Tr. 123). At Step Two, the ALJ concluded Plaintiff had the following severe impairments: "bipolar II disorder and insomnia." (Tr. 27). At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal

4

one of the listings in the regulations. (Tr. 27-29). The ALJ then found that Morris had the

residual functional capacity ("RFC") to perform a full range of work, except that Morris

> requires work that is simple, unskilled and repetitive, with one, two, or three step tasks, with a SVP rating of 1 or 2; occasionally in close proximity to co-workers and supervisors (meaning that the individual can occasionally function as a member of a discrete team); occasionally in direct contact with the public, in a "low stress" environment defined as having only occasional changes in the work setting.

(Tr. 29). At Step Four, the ALJ found that Morris was unable to perform his past relevant work

as a math tutor. (Tr. 33). At Step Five, the ALJ found that a significant number of jobs existed

which Morris could perform despite his limitations. (Tr. 34-35). As a result, the ALJ found

Morris not disabled under the Act. (Tr. 35).

###    E.    Administrative Record

####        1.    Medical Evidence

Morris underwent a mental status exam on January 20, 2006, before military physician

Dr. Ioana Sandu. (Tr. 450-51). Dr. Sandu found that Morris was pleasant and cooperative, had

"average" self-care and eye contact, and normal mood. (Tr. 450). However, she noted that he

experienced rapid shifts in affect, including becoming depressed or happy. (*Id*.). Morris was

found to experience no delusions or perceptual disturbances, and his cognition, judgment, and

insight were generally normal. (*Id*.). Dr. Sandu diagnosed Morris with Bipolar Disorder, the

origin of which she attributed to "anoxia due to hanging suicide attempt." (*Id*.). Morris was

prescribed with Ativan to treat his anxiety and agitation, and Lithium to treat his Bipolar

disorder. (*Id*.). Dr. Sandu concluded:

> Because of this service member's inability to adapt to the stressors of the military as evidence by poor sleep, appetite and energy level,

5

> hopelessness, helplessness and suicidal ideation as well as in light of past abrupt mood changes that impaired his judgment and his ability to control his behavior and past suicide attempt, it is recommended that he receives an entry level separation. If maintained on active duty this service member may become a high risk of harm to self/others.

(Tr. 451). Morris was thereafter honorably discharged from military service. (Tr. 46).

Morris primarily treated at Community Care Services ("CCS"); the first such records are from June 30, 2010. (Tr. 383). On that date, Dr. Tae Park conducted a medication review, and Morris was prescribed Lithium, Depakote, Wellbutrin to treat his anxiety and depression. (Tr. 381-82). Notes from that visit reflect that Morris was inducted to Heritage Hospital in June 2010, to treat his mental conditions following a period of non-compliance with his medications, and was treated for three days before his release. (Tr. 382). Morris had no homicidal or suicidal ideation at that time. (*Id*.).

On August 20, 2010, Morris again visited Dr. Park, this time for a psychiatric evaluation. (Tr. 377-81). Morris complained of depression, anxiety, mood swings, and feelings of loneliness and isolation. (Tr. 377). In recounting his mental health history, Morris told Dr. Park that he had twice attempted to commit suicide, and was twice hospitalized to treat his mental conditions. (*Id*.). Dr. Park found that Morris appeared generally normal, but noted complaints of anxiousness, depression, tiredness, and anhedonia. (Tr. 378). Morris denied any suicidal ideation; his cognition was normal, but he had limited insight and only fair judgment. (Tr. 379). Dr. Park assigned a GAF score of 51.[3] Thesefindings remained largely unchanged

---

[3] A GAF score of fifty-one to sixty indicates, "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev.2000) [hereinafter DSM-IV ].

during progress visits with Dr. Park and social worker Katherine Howe in November and December 2010. (Tr. 369-76).

On December 17, 2010, Dr. Park recorded that Morris made substantial progress: he was calmer, positive, had a stable mood, and wanted to maintain his progress. (Tr. 367). Morris told Dr. Park that his medication was "helpful," and he reported no adverse effects from his medication. (*Id*.). Morris further denied any suicidal ideation or perceptual disturbances. (*Id*.).

On September 15, 2011, a discharge/transfer note was created at CCS to reflect that Morris had moved. (Tr. 216). That note also indicates that Morris "states he ran out of Lithium last Friday," that he had not been in treatment for six months and that he had been "having mixed type bipolar episodes" combined with "feeling more depressed lately." (Tr. 217). It is unclear whether these notes were produced during a therapy session on that date, or whether they merely restate conclusions drawn during a prior therapy session. [4]

On July 3, 2012, Morris underwent a psychological evaluation performed by consultative psychologists Suzann M. Kenna and Terrance A. Mills. (Tr. 305-07). Morris reported that he had not been to CCS in approximately six or seven months, and felt that his medication was not helping. Morris reported getting along well with others, including friends

---

[4] The Commissioner asserts in her brief that Morris did not actually receive treatment from CCS on September 15, 2011, and argues that the medical record produced on that date was merely "an administrative closing of [Morris's] case," thus supporting the ALJ's assertion that Morris went without medical treatment between May 2011 and December 2012. (Doc. 13 at 19). In a January 30, 2013, treatment session, Morris stated that he had "not been in treatment since the last time he was [at CCS]," and in an April 18, 2013, treatment session he reported being out of treatment for approximately two years, thus indicating that he had foregone treatment for nearly two years, supporting the ALJ's finding. (Tr. 320, 427). Irrespective of whether Morris received mental health treatment in September 2011, it seems clear that Morris went without treatment between May 2011 and September 2011, and from September 2011 to December 2012. Even if the ALJ erred by failing to consider Morris's September 2011 treatment session, his conclusion that Morris went without treatment for a significant portion of 2011 and 2012 remains accurate.

and co-workers, and engaged in ballroom dancing and math tutoring. (Tr. 306). Morris stated that his depression, feelings of tiredness, and lack of concentration prevented him from enjoying these activities. (*Id.*). Morris denied having hallucinations or obsessions, but reported feelings of worthlessness and hopelessness. (*Id.*). Kenna and Mills concluded that Morris's mood swings, irritability, and severe depression resulting from bipolar disorder "interferes with his ability to function" and caused "trouble working." (Tr. 307). Kenna and Mills established a GAF score of between 45 and 50,[5] but did not draft an RFC assessment. (*Id.*).

On July 17, 2012, Morris's condition was evaluated by non-examining state agency psychological consultant Dr. Ashok Kaul. (Tr. 62-67). Dr. Kaul found that Morris suffered from moderate depression, and concluded that he was moderately limited in terms of his ability to carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 66). However, he found that Morris "retains sufficient attention and concentration to be able to complete simple tasks." (*Id.*). Dr. Kaul also concluded that Morris was moderately limited in his ability to respond appropriately to changes in work setting, and was "autonomous and independent" such that he was able to "adjust to simple changes." (Tr. 67). Dr. Kaul found that Morris retained the RFC to "understand, remember and carry out simple instructions on a regular, routine and fairly sustained basis. He can tolerate low stress social demands, adjust to simple changes in routine, and work independently and without a need for any special supervision. He remains capable of 1-2-3 step unskilled work." (*Id.*).

---

[5] A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." DSM–IV

On January 30, 2013, Morris returned to CCS for an assessment. (Tr. 427-42). Morris stated that his symptoms were unaltered from his last visit, and that he had not been in treatment "since the last time he was here," apparently referring to his September 15, 2011, discharge from CCS. (Tr. 427). Morris reported experiencing depression, emotional issues, and mood swings, but said that he was not experiencing hallucinations at that time. (*Id.*). Morris noted that he enjoyed ballroom and salsa dancing, writing poetry, reading, and doing math. (Tr. 433). Morris was found to have no ideation, plan, or intent to harm himself or others. (Tr. 439).

On March 26, 2013, Morris worked with a therapist at CCS to develop a crisis plan to manage his bipolar symptoms. (Tr. 314). On April 18, 2013, Morris visited CCS for a psychiatric evaluation before Dr. Hyun Shin. (Tr. 320-24). Morris asserted that the week prior he nearly checked himself into a hospital emergency department because of depressive symptoms, but ultimately walked out. (Tr. 320). Morris also stated that he had not been under treatment for his bipolar condition in two years. (Tr. 320). Dr. Shin found that Morris's mental state was generally normal, except for a history of hallucinations, a slightly withdrawn presentation, and some depression and anxiousness. (Tr. 321-22). Dr. Shin assessed a GAF score of 52. (Tr. 323).

Morris again visited CCS on April 24, 2013, for a progress update. (Tr. 318-19). The therapist noted that Morris had "a lot of insight and motivation toward change," including recognizing that going "off my medication" triggered his mood swings. (Tr. 319). Morris stated that he had suicidal thoughts the week prior, but was able to overcome those thoughts by visiting his mother's home. (*Id.*). Morris's mental state was found to be generally normal, except that he appeared slightly withdrawn, depressed, and anxious. (Tr. 321-22).

9

Morris denied suicidal ideation during largely uneventful progress update visits with CCS on May 16, May 29, June 26, June 12, July 10, and July 23, 2013. (Tr. 399-400, 402, 407, 409, 410). On May 16, 2013, Morris told Dr. Shin that he was sleeping "good," that "everything [was] doing fine," and that his mood was stable. (Tr. 410).

By June 13, 2013, Morris reported to Dr. Shin that he was doing well on Lithium, and was not having severe mood swings despite being "off and on" Lithium. (Tr. 404). Dr. Shun again assessed a GAF score of 52. In his final visits with CCS in the record on July 10 and 23, Morris did not report any significant changes in his mental state. (Tr. 398-401). During his July 10, 2013, visit, Morris noted that he had not been compliant with his medication regimen because of unstated side effects, but did not report any negative outcomes resulting from that non-compliance. (Tr. 400). Therapist Leah Herbert recorded that Morris had "developed adaptive coping skills to utilize when feeling depressed." (Tr. 401).

### 2.    Application Reports and Administrative Hearing

### a.    Morris's Function Report

Morris completed a function report on May 16, 2012. (Tr. 167-177). In that report, Morris stated that his illnesses prevent him from working because he is rendered unable "to adapt to the stressors of work as evidenced by poor sleep, appetite and energy level, hopelessness and suicidal ideation as well as past abrupt mood changes that impaired my judgment and my behavior and past suicide attempt." (Tr. 167). Morris asserted that he sometimes sleeps for nearly the entire day, particularly when he is "in a mood." (Tr. 168). Morris also reported that his conditions sometimes cause him to not bathe, dress, go out of the house, fix his hair, shave, or eat for days at a time. (Tr. 168). Morris asserted that he requires

10

reminders to perform grooming and take medicine, however he also prepares his own meals, including "complete meals with several courses," and performs cleaning and laundry. (Tr. 169). He reported that he goes out "almost every day lately," drives or walks to his destinations, and shops for food approximately monthly. (Tr. 170). Morris reported no restrictions in his ability to handle money or pay bills. (*Id.*). Morris stated that his hobbies include reading, ballroom dancing weekly, watching movies, and taking trips. (Tr. 171). He declared that "my conditions ha[ve] created these hobbies. They quiet the thoughts in my head." (*Id.*). Morris asserted that his conditions impaired his memory, ability to complete tasks, and ability to concentrate. (Tr. 172). However, he also reported that he can pay attention for one to two hours, and can follow both written and verbal instructions well when concentrating. (*Id.*). He reported no difficulties getting along with others, but asserted that decision making and changes in routine cause him to experience depression and stress. (Tr. 173). Morris also reported that he feared that he "will one day lose the control [over] the will to live." (*Id.*). Regarding side effects from his medication, Morris stated that Lithium causes headaches, weight gain, and dry mouth, and that Wellbutrin causes trouble sleeping and a strange taste in his mouth. (Tr. 174).

### b.    Morris's Testimony at the Administrative Hearing

At the September 5, 2013 hearing before the ALJ, Morris testified that he suffers from manic and depressive symptoms, including difficulty sleeping, despite treating his conditions with medication. (Tr. 45). Morris asserted that his medication causes side effects including weight gain and changes in the taste of food. (Tr. 50). However, he also noted that his medication helps to resolve his symptoms. (Tr. 49).

11

Morris stated that he spends his days sleeping, and spends his nights reading, listening to music, using the computer, visiting with friends weekly, and ballroom dancing weekly. (Tr. 45-46). He complained of difficulty focusing and concentrating, and an increased "sexual appetite" and desire to take risks. (Tr. 46, 48, 50-51). Morris asserted that he experiences mania approximately once monthly for one week at a time, during which time he sleeps little; following such manic periods, Morris asserted that he becomes depressive, including suicidal ideation, sleeping much of the time, and eating little. (Tr. 49). Morris testified that on an average day he sleeps approximately four hours, and naps for four to five hours during the day. (Tr. 50). While depressed, Morris stated that he does not clean, shower, or bathe for up to three days at a time, and that "nothing really gets done" on those days. (Tr. 51).

Morris stated that his military service was terminated because he was not sleeping or eating, and experienced claustrophobia and crying. (Tr. 47). Morris asserted that he was terminated from his math tutoring position because of tardiness, resulting from what he characterized as "oversleeping or just not having the willpower to go [to work]." (*Id*.). He would often be an hour tardy to work, and would sometimes lack the willpower to go to work for a week at a time. (*Id*.). However, Morris noted that he was ultimately fired when he stopped attending work to care for to his mother after she was diagnosed with cancer. (Tr. 48).

### c.    The VE's Testimony at the Administrative Hearing

The VE characterized Morris's past relevant work as a mathematics tutor as skilled, and performed at the light level of exertion. (Tr. 54). The ALJ asked the VE to imagine a claimant of Morris's age, education, and work experience in a series of hypothetical questions. First, the ALJ asked the VE to imagine a worker who requires work that is "simple, unskilled and

12

repetitive with one, two or three-step tasks," which has a Specific Vocational Preparation ("SVP") level of 1 or 2, who can occasionally work in close proximity to coworkers and supervisors, only occasionally functions as a member of a discrete team, who is occasionally in direct contact with the public, and who works in a low-stress environment, defined as one which has only occasional changes in the work setting. (*Id.*). The VE testified that such a worker could not perform Morris's past work, but could work as an office cleaner (6,000 jobs in Southeastern Michigan), machine tender (10,000 jobs), and mail sorter (1,500 jobs). (Tr. 54-55).

The ALJ then posed a more restrictive hypothetical, including all of the limitations of the first hypothetical and adding that the worker would be required to be off task for at least one hour during an eight-hour workday; the VE testified that such a limitation would preclude all competitive work. (Tr. 55-56).

Finally, the ALJ asked the VE to again hypothesize an individual who has all of the limitations included in his first hypothetical, but who will miss more than two workdays per month; the VE testified that such a limitation would also preclude all competitive work. (Tr. 56).

Morris's attorney then asked the VE whether a hypothetical worker who was thirty minutes late to work one to three times per week could maintain competitive employment; the VE testified that such a worker "would not keep employment very long." (Tr. 56).

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, but the

only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). ALJs must also

apply those factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"), and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence.

*Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390.

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the

16

existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)   [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical

17

question to the VE is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.     Analysis

Morris argues that the ALJ erred in the following respects: 1) erroneously favoring the opinion of a non-examining physician over that of examining physicians; 2) improperly considering Morris's inconsistent treatment history and unemployment application in rendering his credibility finding; 3) issuing an RFC analysis which did not incorporate several of Morris's well-supported limitations. The Court addresses these arguments in turn.

### 1.     The ALJ Did Not Err in Assessing the Weight Given to the Treating and Non-Treating Physicians' Opinions

Morris first asserts that the ALJ improperly assigned greater weight to the opinion of the non-examining physician, Dr. Kaul, than to Morris's examining physicians, Drs. Mill and Kenna. (Doc. 12 at 10-11). Morris also asserts that the ALJ "failed to adduce evidence contradicting the Mills/Kenna Report," erroneously found that the Mills/Kenna findings were based on subjective complaints, and did not properly consider that Morris continued to receive mental health treatment "well into 2013." (*Id.* at 11).

As examining, non-treating physicians, Drs. Mills and Kenna's report is generally entitled to more deference than the opinion of a non-examining physician like Dr. Kaul. *See* 20 C.F.R. § 404.1527; *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013); *McKnight v. Comm'r of Soc. Sec.*, No. 11-13376, 2012 WL 3966337, at *13 (E.D. Mich. Sept. 10, 2012) ("An examining physician's medical opinion is entitled to greater deference than a

18

nonexamining source, such as the Department of Disability Service consultants."). However, an examining physician's opinion is not due deference when it is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

As the ALJ properly noted, Drs. Mills and Kenna's report was comprised primarily of subjective complaints made by Morris, and failed to specifically address Morris' limitations resulting from his mental maladies. (Tr. 33). Indeed, Mills and Kenna merely conclude that Morris "has a history of bipolar disorder," that "[h]is depression interferes with his ability to function," and that "[h]e had trouble working because when he was depressed he stayed home," in addition to an ambiguous (and perhaps abridged) remark that "[h]is mood swings, irritability, and severe depressions." (Tr. 307). Mills and Kenna's objective observations are similarly sparse and unhelpful: they observed that Morris's gait, posture, grooming, eye contact, and mood were normal. (Tr. 306); they found that his motor activity was retarded, he had poor self-esteem, low motivation, constricted affect, and was "dependent" (*Id.*). Morris's responses to a battery of questions testing sensorium and mental capacity were nominal. (*Id.*). Drs. Mills and Kenna did not opine that Morris would require certain restrictions in the workplace, nor did they conclude that he would be unable to work. (Tr. 307). Further, they made no conclusions regarding the effectiveness of Morris's medical treatment. They failed to draft a mental RFC assessment. While the GAF score of 45-50 assigned by Mills and Kenna suggests some level of limitation, a "GAF score alone would not be dispositive of whether an individual is disabled." *Davenport v. Comm'r of Soc. Sec.*, No. CIV.A. 10-11350, 2011 WL 2601017, at *7 (E.D. Mich. May 9, 2011); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F.

App'x 496, 511 (6th Cir. 2006) (noting that "[a GAF] score may have little or no bearing on the subject's social and occupational functioning").

The Court does not ignore the restrictive symptoms which Mills and Kenna recorded in their report, including Morris having a "hard time getting out of bed," being unable to "go anywhere or do anything for days and sometimes weeks." (Tr. 306). However, as the ALJ noted, these are not objective observations, but rather appear to be a reflection of Morris's subjective complaints. (Tr. 33). A physician's notes are not due any deference insofar as they merely record subjective complaints, because such notes do not reflect considered medical analysis. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). Further, as the ALJ notes, Mills and Kenna's report does not accurately reflect the substantial progress Morris made through therapy sessions at CCS during mid-to-late 2013. (Tr. 33, 399-400, 402, 407, 409, 410).

Morris also argues that the ALJ erred in his assignment of great weight to the opinion of non-examining psychological consultant Dr. Kaul. (Doc. 12 at 12). Morris notes that Dr. Kaul's opinion was issued on July 17, 2012, and thus was rendered without the benefit of "much of the medical evidence" which was produced after that date, including continued administration of psychotropic medication, the persistence of his bipolar disorder and depression, experiencing suicidal ideation in March of 2013, and the impact of his mother's cancer diagnosis. (*Id*.). While a physician will ideally base his or her opinion on a full and complete medical record, "[t]here is no categorical requirement that the non-treating source's opinion be based on a complete . . . case record. The opinions need only be supported by

20

evidence in the case record." *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quotation omitted). Morris's medical records created after Dr. Kaul's assessment are generally consistent with the records to which Dr. Kaul was privy, thus there is not a good reason to believe that his opinion would have been different if he had access to those latter records. Morris complained of no changes during his January 2013 visit to CCS (Tr. 427); during his March 2013 visit he asserted that he nearly checked himself into the hospital, but did not discuss any symptoms or restrictions on his activities of daily living resulting from this incident (Tr. 320); Morris reported suicidal thoughts during an April 2013 checkup, but was able to resolve his symptoms without medical intervention (Tr. 319); he stated that "everything [was] doing fine" in May 2013 (Tr. 410); in June 2013 he reported not having severe mood swings (Tr. 404); he reported no suicidal thoughts in May, June, or July of 2013 despite non-compliance with his medication regimen (Tr. 399-400, 402, 407, 409, 410). Morris's medical records following Dr. Kaul's assessment thus show generally consistent, positive results. It is also notable that Morris reported non-compliance with his medication during several of his latter visits to CCS, yet did not report disruptive bipolar symptoms or depression resulting from that lack of treatment, suggesting that Morris's conditions are sufficiently well managed even without use of medication. (Tr. 400). As the ALJ noted, this progress is entirely consistent with Dr. Kaul's finding that Morris retained the ability to perform one to three step unskilled work. (Tr. 33).

There is thus no reason to believe that Dr. Kaul's assessment would have differed significantly if he had access to Morris's complete medical record.

### 2.    *The ALJ Properly Considered Morris's Credibility*

Next, Morris argues that the ALJ erred by improperly considering his non-compliance with his medication regimen. (Doc. 12 at 13-14). The ALJ noted in his decision that Morris failed to take medication or seek medical services to treat his disorders several times during the course of his treatment. (Tr. 30-32). Morris asserts that consideration of this failure to comply with his medication is reversible error because the failure to properly treat a mental condition is evidence of that condition's severity rather than evidence of its non-disabling status. (Doc. 12 at 13-14). Morris is correct that a substantial body of law cautions against making negative credibility findings on the basis of non-compliance with treatment regimens where the claimant suffers from a mental disorder which may be the very cause of such noncompliance. *See*, *e.g.*, *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 436 (6th Cir. 2013) ("[A] claimant's failure to seek mental health treatment is not probative of whether a mental impairment exists and should not be determinative in a credibility assessment"); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself").

Morris further argues that the ALJ erred by failing to consider the possible good reasons for failure to comply with his medication regimen, consistent with 20 C.F.R. §404.1530(c). Specifically, Morris argues that the ALJ did not properly consider all of the factors which should be analyzed in assessing a claimant's credibility under 20 C.F.R. § 404.1529(c)(1)-(3), including his work history, daily activities, and treatment. (Doc. 12 at 15-21). An ALJ need not

cite every element which might impact credibility in his or her decision, but must rather consider all of those elements in rendering that decision. *See Wandrie v. Comm'r of Soc. Sec.*, No. 13-10570, 2013 WL 5770379, at *7 (E.D. Mich. Oct. 24, 2013) ("[A]n ALJ need not explicitly discuss every factor [listed in 20 C.F.R. § 404.1529(c)(2)-(3)]."). The ALJ properly referenced the improvement in Morris's symptoms with consistent treatment, his ability to live alone and perform self-care, his hobbies including ballroom and salsa dancing, and his inconsistent filing for unemployment benefits and Social Security benefits. (Doc. 13 at 15-16). Contrary to Morris's suggestion, the ALJ did consider his prior work history and attempts to work. (Doc. 12 at 15; Tr. 30-31). Moreover, nothing in the record indicates that Morris's condition drove him to avoid treatment, and his progress notes at CCS record that he understood both the causes and solutions for his conditions. (Tr. 401). The ALJ thus did not err by considering Morris's spotty treatment record.

Morris also asserts that the ALJ incorrectly found that Morris did not seek medical treatment between May 2011 and December 2012. (Doc. 12 at 17). However, as noted *supra* at fn. 4, irrespective of whether Morris's September 15, 2011, medical record from CCS reflects a treatment session or merely an administrative closing of his case, the parties do not dispute that Morris went without treatment between May 2011 and September 2011, and again between September 2011 and December 2012. (Doc. 13 at 19; Doc. 12 at 17). The ALJ properly considered these lapses in treatment, and his conclusions rest securely on that basis regardless of whether Morris sought treatment on September 15, 2011. (Tr. 31-32).

Next, Morris argues that the ALJ did not consider the limiting side-effects of the medications used to treat his mental disorders, including "sleep disturbance and fatigue." (Doc.

23

12 at 17). This is also incorrect, as the ALJ directly noted these side-effects in his decision. (Tr. 30). The ALJ properly found that the side effects Morris experiences from his medications are not disabling based on his self-reported activities of daily living, including ballroom dancing, maintaining relationships with friends, reading, living alone and caring for his own needs, and providing care for his mother when she was ill. (Tr. 32).

Morris next argues that the ALJ erred by considering his receipt of unemployment benefits contemporaneously with his application for disability benefits. (Doc. 13 at 19-21). Morris asserts that Sixth Circuit precedent authorizes concurrent applications for unemployment and disability benefits. (Doc. 12 at 18-19). He references a non-binding memorandum drafted by chief ALJ Frank Cristaudo, which he argues should prohibit ALJs from "tak[ing] unemployment into consideration" in deciding issues of claimant credibility. (Doc. 12 at 19). Morris argues that the Sixth Circuit has not directly addressed this memorandum, but that decisions drafted after that memorandum have held that "applications for both unemployment and disability may be maintained [concurrently]." (*Id.*). However, even the case which Morris cites for this proposition holds that "[t]o be sure, a claimant's collection unemployment benefits while alleging disability can be used in support of a non-disability finding . . . . However, before doing so, the ALJ [must] consider the entirety of circumstances surrounding the application for benefits." *O'Neal v. Comm'r of Soc. Sec.*, No. 12-13273, 2013 WL 4550430, at *8 (E.D. Mich. Aug. 28, 2013); *see also Nace v. Comm'r of Soc. Sec.*, No. 13-12770, 2015 WL 1511055, at *28 (E.D. Mich. Mar. 25, 2015) (holding that ALJs may, at a minimum, consider concurrent applications for unemployment and disability benefits in rendering a credibility decision); *Morrison v. Comm'r of Soc. Sec.*, No. 13-12561, 2014 WL

4658702, at *13 (E.D. Mich. Sept. 17, 2014) (holding that an ALJ's credibility determination was due its usual deference where the ALJ considered a claimant's incompatible applications for disability and unemployment benefits, but did not base his credibility determination solely on that criteria). As discussed above, the ALJ properly considered Morris's concurrent, incompatible applications for disability and unemployment benefits as one criteria among many in rendering his credibility determination. The ALJ thus did not err by considering these incompatible applications.

Morris also argues that there is no inconsistency between his averment that he was ready, willing, and able to work, while at the same time filing for disability benefits, because self-employment as a math tutor would permit him to make certain accommodations which would be unavailable elsewhere in the economy. (Doc. 12 at 20). First, nothing in the record indicates that Morris's self-employed tutoring business was anything more than a pipe dream since there is no evidence of earnings made from the alleged tutoring business. More importantly, Morris testified that he was terminated from his position as a math tutor at Wayne County Community College in part due to his tardiness, which he attributes to his depression and bipolar disorders, and stated that his employer's attempted accommodations did not permit him to complete his work. (Tr. 47-48). Consequently, it appears that Morris has attempted to have it both ways, attesting that he was ready, willing, and able to perform work to qualify for unemployment benefits, while simultaneously contending that he was rendered unable to work because of his impairments to qualify for social security benefits.

In sum, the ALJ appropriately considered Morris's credibility, and cited to his daily activities, frequency and intensity of symptoms, medications and side effects, and work

history, and thus provided "specific reasons for the finding on credibility, supported by evidence in the case record," that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96–7p, 1996 WL 374186, at *2.

### 3. The ALJ's RFC Assessment Was Proper

Finally, Morris argues that the ALJ's decision is not supported by substantial evidence because he failed to incorporate into his RFC assessment several restrictions caused by Morris's mental ailments which are well supported by the medical record. (Doc. 12 at 21-22). Morris asserts that he suffers from "absenteeism due to a lack of motivation, lack of concentration, and sleep deprivation," which would prevent him from maintaining any competitive employment whatsoever. (*Id*.). Because the VE testified that restrictions accounting for these behaviors, including being off task for one hour daily and being absent two or more times a month would preclude work, Morris concludes that he should be found disabled. (*Id*.).

Morris's argument fails because neither of his alleged workplace accommodations, *i.e.* being off task for one hour in an eight-hour workday and missing more than two days of work per month, are well supported by the medical record. The ALJ thus acted properly by refusing to include them in his RFC and related hypothetical. To be certain, Morris's medical and work records demonstrate that he suffered from severe depression and bipolar symptoms which caused him great emotional distress, and which were linked to the absenteeism and tardiness interfered with his employment. (*See*, *e.g.*, Tr. 216-17, 377-83). However, as the ALJ properly discussed, Morris's records also detail his successful mental health treatment and progression

towards emotional and mental stability. The ALJ discussed Morris's report of "worsening . . . depression" in May 2011 (Tr. 31, 218), but also noted that his condition improved with treatment (*Id.*). Morris's depression continued during a September 2011 visit with CCS, and he experienced "mixed type bipolar episodes." (Tr. 217). Morris's condition worsened due to a lack of treatment between December 2012 and January 2013, but the reestablishment of a medication regimen caused Morris to remark in May 2013 that "everything is doing fine," without any notable mood swings, sleep issues, medication side effects, or other limiting effects of his depression or bipolar symptoms. (Tr. 31, 410). Morris's latter medical records in May through July of 2013 note that his depression was under control, and reflect no significant restrictions caused by his conditions. (Tr. 32, 398-409). While Morris reported some non-compliance with his medications on July 10, 2013, there is no indication that he experienced a recurrence of his bipolar or depressive symptoms as a result. (Tr. 398-401). Moreover, Morris's own statements during that session seem to indicate that he was able to manage his depression and bipolar disorders without the use of medication; he stated "I know what I need to do to manage [my symptoms] until I feel better. Go dancing, talk to my mom, and engage my mind in things." (Tr. 401). These records do not suggest that Morris has been totally cured of his depression and bipolar disorder, but the latest available medical evidence seems to indicate that he has sufficiently well managed those conditions through the periodic use of medicine and coping techniques such that he is able to pursue remunerative, competitive employment.

The ALJ also properly noted that Morris's activities of daily living are inconsistent with his reportedly severe symptoms resulting from his mental conditions. (Tr. 31-32). Morris's

self-reported participation in ballroom and salsa dancing, reading, spending time with friends, and talking on the phone are largely inconsistent with the severe symptoms from which he allegedly suffers. (Tr. 32, 51-52). Morris's latter medical records do not corroborate his assertion that he experiences week-long manic episodes monthly, followed by periods of depression, nor his assertion that he has two "bad days" of depression per week during which "nothing really gets done." (Tr. 51-52). Furthermore, the ALJ noted that despite Morris's alleged inability to self-care during his depressive episodes, he lives alone and reports being able to take care of his personal grooming, shopping, cooking, and cleaning without assistance, and was even able to provide care for his mother. (Tr. 32, 169).

In sum, the ALJ properly considered and weighed the opinions of Drs. Mills and Kenna and Dr. Kaul, and appropriately gave greater weight to the opinion produced by Dr. Kaul. The ALJ properly considered Morris's credibility, including consideration of his daily activities, reported symptoms, and work history. Finally, the ALJ properly included in his RFC analysis and related hypothetical all of the restrictions suffered by Morris which are supported by the medical evidence of record. For these reasons, the Court finds that the ALJ's decision was supported by substantial evidence.

### G. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Morris's Motion for Summary Judgment (Doc. 12) be **DENIED**, the Commissioner's Motion (Doc. 13) be **GRANTED**, and that this case be **AFFIRMED**.

III.    **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 9, 2015                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 9, 2015                     By s/Kristen Krawczyk
                                        Case Manager to Magistrate Judge Morris