UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

T<small>YREE</small> R<small>ONELL</small> M<small>ORRIS</small>,

        Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

Case No. 14-14406

S<small>ENIOR</small> U.S. D<small>ISTRICT</small> J<small>UDGE</small>
A<small>RTHUR</small> J. T<small>ARNOW</small>

U.S. M<small>AGISTRATE</small> J<small>UDGE</small>
P<small>ATRICIA</small> T. M<small>ORRIS</small>

**O<small>RDER</small> D<small>ECLINING TO</small> A<small>DOPT</small> R<small>EPORT AND</small> R<small>ECOMMENDATION</small> [16]; G<small>RANTING</small> P<small>LAINTIFF'S</small> M<small>OTION FOR</small> S<small>UMMARY</small> J<small>UDGMENT</small> [12]; D<small>ENYING</small> D<small>EFENDANT'S</small> M<small>OTION FOR</small> S<small>UMMARY</small> J<small>UDGMENT</small> [13]; <small>AND</small> R<small>EMANDING THE</small> C<small>ASE</small>**

Plaintiff seeks review of Defendant's denial of his application for disability benefits. Plaintiff filed a Motion for Summary Judgment [12] on February 26, 2015. Defendant filed a Motion for Summary Judgment [13] on March 10, 2015. On July 9, 2015 Magistrate Judge Morris issued a Report and Recommendation ("R&R") [16] recommending that Defendant's Motion for Summary Judgment [13] be granted and that Plaintiff's Motion for Summary Judgment [12] be denied. Plaintiff filed an Objection to the R&R [17] on July 23, 2015 and Defendant replied to the objection [18] on July 29, 2015.

1

For the reasons stated below, the Court **DECLINES TO ADOPT** the R&R [16], Plaintiff's Motion for Summary Judgment [12] is **GRANTED**, and Defendant's Motion for Summary Judgment [13] is **DENIED**. The case is **REMANDED** for further proceedings.

## STATEMENT OF FACTS

Plaintiff applied for disability benefits on April 18, 2012, alleging that he became disabled on May 15, 2011. Plaintiff's application was denied on July 17, 2012, and a hearing was held before an Administrative Law Judge (ALJ) on September 5, 2013. On October 3, 2013, the ALJ issued a written decision in which Plaintiff was found to be not disabled. On September 13, 2014, the Appeals Council denied review and Plaintiff filed for judicial review of the final decision on November 17, 2014.

The Magistrate Judge summarizes the administrative record as follows:

> Morris underwent a mental status exam on January 20, 2006, before military physician Dr. Ioana Sandu. (Tr. 450-51). Dr. Sandu found that Morris was pleasant and cooperative, had "average" self-care and eye contact, and normal mood. (Tr. 450). However, she noted that he experienced rapid shifts in affect, including becoming depressed or happy. (*Id*.). Morris was found to experience no delusions or perceptual disturbances, and his cognition, judgment, and insight were generally normal. (*Id*.). Dr. Sandu diagnosed Morris with Bipolar Disorder, the origin of which she attributed to "anoxia due to hanging suicide attempt." (*Id*.). Morris was prescribed with Ativan to treat his anxiety and agitation, and Lithium to treat his Bipolar disorder. (*Id*.). Dr. Sandu concluded:

2

> Because of this service member's inability to adapt to the stressors of the military as evidenced by poor sleep, appetite and energy level, hopelessness, helplessness and suicidal ideation as well as in light of past abrupt mood changes that impaired his judgment and his ability to control his behavior and past suicide attempt, it is recommended that he receives an entry level separation. If maintained on active duty this service member may become a high risk of harm to self/others.

(Tr. 451). Morris was thereafter honorably discharged from military service. (Tr. 46).

Morris was primarily treated at Community Care Services ("CCS"); the first records of such treatment are from June 30, 2010. (Tr. 383). On that date, Dr. Tae Park conducted a medication review, and Morris was prescribed Lithium, Depakote, Wellbutrin to treat his anxiety and depression. (Tr. 381-82). Notes from that visit reflect that Morris was admitted to Heritage Hospital in June 2010, to treat his mental conditions following a period of non-compliance with his medications, and was treated for three days before his release. (Tr. 382). Morris had no homicidal or suicidal ideation at that time. (*Id.*).

On August 20, 2010, Morris again visited Dr. Park, this time for a psychiatric evaluation. (Tr. 377-81). Morris complained of depression, anxiety, mood swings, and feelings of loneliness and isolation. (Tr. 377). In recounting his mental health history, Morris told Dr. Park that he had twice attempted to commit suicide, and was twice hospitalized to treat his mental conditions. (*Id.*). Dr. Park found that Morris appeared generally normal, but noted complaints of anxiousness, depression, tiredness, and anhedonia. (Tr. 378). Morris denied any suicidal ideation; his cognition was normal, but he had limited insight and only fair judgment. (Tr. 379). Dr. Park assigned a GAF score of 51. These findings remained largely unchanged during progress visits with Dr. Park and social worker Katherine Howe in November and December 2010. (Tr. 369-76). On December 17, 2010, Dr. Park recorded that Morris made substantial progress: he was calmer, positive, had a stable mood, and wanted to maintain his progress. (Tr. 367). Morris told Dr. Park that his medication was "helpful," and he reported no adverse effects from his medication. (*Id.*). Morris further denied any suicidal ideation or perceptual disturbances. (*Id.*).

3

On September 15, 2011, a discharge/transfer note was created at CCS to reflect that Morris had moved. (Tr. 216). That note also indicates that Morris "states he ran out of Lithium last Friday," that he had not been in treatment for six months and that he had been "having mixed type bipolar episodes" combined with "feeling more depressed lately." (Tr. 217). It is unclear whether these notes were produced during a therapy session on that date, or whether they merely restate conclusions drawn during a prior therapy session.[1]

On July 3, 2012, Morris underwent a psychological evaluation performed by consultative psychologists Suzann M. Kenna and Terrance A. Mills. (Tr. 305-07). Morris reported that he had not been to CCS in approximately six or seven months, and felt that his medication was not helping. Morris reported getting along well with others, including friends and co-workers, and engaged in ballroom dancing and math tutoring. (Tr. 306). Morris stated that his depression, feelings of tiredness, and lack of concentration prevented him from enjoying these activities. (*Id.*). Morris denied having hallucinations or obsessions, but reported feelings of worthlessness and hopelessness. (*Id.*). Kenna and Mills concluded that Morris's mood swings, irritability, and severe depression resulting from bipolar disorder "interferes with his ability to function" and caused "trouble working." (Tr. 307). Kenna and Mills established a GAF score of between 45 and 50, but did not draft an RFC assessment. (*Id.*).

On July 17, 2012, Morris's condition was evaluated by non-examining state agency psychological consultant Dr. Ashok Kaul. (Tr. 62-67). Dr. Kaul found that Morris suffered from moderate depression, and concluded that he was moderately limited in terms of his ability to carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 66). However, he found that Morris "retains sufficient

---

[1] The Commissioner asserts in her brief that Morris did not actually receive treatment from CCS on September 15, 2011, and argues that the medical record produced on that date was merely "an administrative closing of [Morris's] case," thus supporting the ALJ's assertion that Morris went without medical treatment between May 2011 and December 2012. (Doc. 13 at 19). In a January 30, 2013, treatment session, Morris stated that he had "not been in treatment since the last time he was [at CCS]," and in an April 18, 2013 treatment session he reported being out of treatment for approximately two years, thus indicating that he had foregone treatment for nearly two years, supporting the ALJ's finding. (Tr. 320, 427). Irrespective of whether Morris received mental health treatment in September 2011, it seems clear that Morris went without treatment between May 2011 and September 2011, and from September 2011 to December 2012. Even if the ALJ erred by failing to consider Morris's September 2011 treatment session, his conclusion that Morris went without treatment for a significant portion of 2011 and 2012 remains accurate.

4

attention and concentration to be able to complete simple tasks." (*Id.*). Dr. Kaul also concluded that Morris was moderately limited in his ability to respond appropriately to changes in work setting, and was "autonomous and independent" such that he was able to "adjust to simple changes." (Tr. 67). Dr. Kaul found that Morris retained the RFC to "understand, remember and carry out simple instructions on a regular, routine and fairly sustained basis. He can tolerate low stress social demands, adjust to simple changes in routine, and work independently and without a need for any special supervision. He remains capable of 1-2-3 step unskilled work." (*Id.*).

On January 30, 2013, Morris returned to CCS for an assessment. (Tr. 427-42). Morris stated that his symptoms were unaltered from his last visit, and that he had not been in treatment "since the last time he was here," apparently referring to his September 15, 2011, discharge from CCS. (Tr. 427). Morris reported experiencing depression, emotional issues, and mood swings, but said that he was not experiencing hallucinations at that time. (*Id.*). Morris noted that he enjoyed ballroom and salsa dancing, writing poetry, reading, and doing math. (Tr. 433). Morris was found to have no ideation, plan, or intent to harm himself or others. (Tr. 439).

On March 26, 2013, Morris worked with a therapist at CCS to develop a crisis plan to manage his bipolar symptoms. (Tr. 314). On April 18, 2013, Morris visited CCS for a psychiatric evaluation before Dr. Hyun Shin. (Tr. 320-24). Morris asserted that the week prior he nearly checked himself into a hospital emergency department because of depressive symptoms, but ultimately walked out. (Tr. 320). Morris also stated that he had not been under treatment for his bipolar condition in two years. (Tr. 320). Dr. Shin found that Morris's mental state was generally normal, except for a history of hallucinations, a slightly withdrawn presentation, and some depression and anxiousness. (Tr. 321-22). Dr. Shin assessed a GAF score of 52. (Tr. 323).

Morris again visited CCS on April 24, 2013, for a progress update. (Tr. 318-19). The therapist noted that Morris had "a lot of insight and motivation toward change," including recognizing that going "off my medication" triggered his mood swings. (Tr. 319). Morris stated that he had suicidal thoughts the week prior, but was able to overcome those thoughts by visiting his mother's home. (*Id.*). Morris's mental state was found to be generally normal, except that he appeared slightly withdrawn, depressed, and anxious. (Tr. 321-22).

5

Morris denied suicidal ideation during largely uneventful progress update visits with CCS on May 16, May 29, June 26, June 12, July 10, and July 23, 2013. (Tr. 399-400, 402, 407, 409, 410). On May 16, 2013, Morris told Dr. Shin that he was sleeping "good," that "everything [was] doing fine," and that his mood was stable. (Tr. 410).

By June 13, 2013, Morris reported to Dr. Shin that he was doing well on Lithium, and was not having severe mood swings despite being "off and on" Lithium. (Tr. 404). Dr. Shun again assessed a GAF score of 52. In his final visits with CCS in the record on July 10 and 23, Morris did not report any significant changes in his mental state. (Tr. 398-401). During his July 10, 2013, visit, Morris noted that he had not been compliant with his medication regimen because of unstated side effects, but did not report any negative outcomes resulting from that non-compliance. (Tr. 400). Therapist Leah Herbert recorded that Morris had "developed adaptive coping skills to utilize when feeling depressed." (Tr. 401).

Morris completed a function report on May 16, 2012. (Tr. 167-177). In that report, Morris stated that his illnesses prevent him from working because he is rendered unable "to adapt to the stressors of work as evidenced by poor sleep, appetite and energy level, hopelessness and suicidal ideation as well as past abrupt mood changes that impaired my judgment and my behavior and past suicide attempt." (Tr. 167). Morris asserted that he sometimes sleeps for nearly the entire day, particularly when he is "in a mood." (Tr. 168). Morris also reported that his conditions sometimes cause him to not bathe, dress, go out of the house, fix his hair, shave, or eat for days at a time. (Tr. 168). Morris asserted that he requires reminders to perform grooming and take medicine, however he also prepares his own meals, including "complete meals with several courses," and performs cleaning and laundry. (Tr. 169). He reported that he goes out "almost every day lately," drives or walks to his destinations, and shops for food approximately monthly. (Tr. 170). Morris reported no restrictions in his ability to handle money or pay bills. (*Id.*). Morris stated that his hobbies include reading, ballroom dancing weekly, watching movies, and taking trips. (Tr. 171). He declared that "my conditions ha[ve] created these hobbies. They quiet the thoughts in my head." (*Id.*). Morris asserted that his conditions impaired his memory, ability to complete tasks, and ability to concentrate. (Tr. 172). However, he also reported that he can pay attention for one to two hours, and can follow both written and verbal instructions well when concentrating. (*Id.*). He reported no difficulties getting along with others, but asserted that decision making and changes in routine cause

him to experience depression and stress. (Tr. 173). Morris also reported that he feared that he "will one day lose the control [over] the will to live." (*Id*.). Regarding side effects from his medication, Morris stated that Lithium causes headaches, weight gain, and dry mouth, and that Wellbutrin causes trouble sleeping and a strange taste in his mouth. (Tr. 174).

At the September 5, 2013 hearing before the ALJ, Morris testified that he suffers from manic and depressive symptoms, including difficulty sleeping, despite treating his conditions with medication. (Tr. 45). Morris asserted that his medication causes side effects including weight gain and changes in the taste of food. (Tr. 50). However, he also noted that his medication helps to resolve his symptoms. (Tr. 49).

Morris stated that he spends his days sleeping, and spends his nights reading, listening to music, using the computer, visiting with friends weekly, and ballroom dancing weekly. (Tr. 45-46). He complained of difficulty focusing and concentrating, and an increased "sexual appetite" and desire to take risks. (Tr. 46, 48, 50-51). Morris asserted that he experiences mania approximately once monthly for one week at a time, during which time he sleeps little; following such manic periods, Morris asserted that he becomes depressive, including suicidal ideation, sleeping much of the time, and eating little. (Tr. 49). Morris testified that on an average day he sleeps approximately four hours, and naps for four to five hours during the day. (Tr. 50). While depressed, Morris stated that he does not clean, shower, or bathe for up to three days at a time, and that "nothing really gets done" on those days. (Tr. 51).

Morris stated that his military service was terminated because he was not sleeping or eating, and experienced claustrophobia and crying. (Tr. 47). Morris asserted that he was terminated from his math tutoring position because of tardiness, resulting from what he characterized as "oversleeping or just not having the willpower to go [to work]." (*Id*.). He would often be an hour tardy to work, and would sometimes lack the willpower to go to work for a week at a time. (*Id*.). However, Morris noted that he was ultimately fired when he stopped attending work to care for to his mother after she was diagnosed with cancer. (Tr. 48).

The VE characterized Morris's past relevant work as a mathematics tutor as skilled, and performed at the light level of exertion. (Tr. 54). The ALJ asked the VE to imagine a claimant of Morris's age, education, and work experience in a series of hypothetical questions. First, the ALJ asked the

VE to imagine a worker who requires work that is "simple, unskilled and repetitive with one, two or three-step tasks," which has a Specific Vocational Preparation ("SVP") level of 1 or 2, who can occasionally work in close proximity to coworkers and supervisors, only occasionally functions as a member of a discrete team, who is occasionally in direct contact with the public, and who works in a low-stress environment, defined as one which has only occasional changes in the work setting. (*Id*.). The VE testified that such a worker could not perform Morris's past work, but could work as an office cleaner (6,000 jobs in Southeastern Michigan), machine tender (10,000 jobs), and mail sorter (1,500 jobs). (Tr. 54-55).

The ALJ then posed a more restrictive hypothetical, including all of the limitations of the first hypothetical and adding that the worker would be required to be off task for at least one hour during an eight-hour workday; the VE testified that such a limitation would preclude all competitive work. (Tr. 55-56).

Finally, the ALJ asked the VE to again hypothesize an individual who has all of the limitations included in his first hypothetical, but who will miss more than two workdays per month; the VE testified that such a limitation would also preclude all competitive work. (Tr. 56).

Morris's attorney then asked the VE whether a hypothetical worker who was thirty minutes late to work one to three times per week could maintain competitive employment; the VE testified that such a worker "would not keep employment very long." (Tr. 56).

Following the five-step sequential analysis, the ALJ found Morris not disabled under the Act. The ALJ found at Step One that Morris had not engaged in substantial gainful activity since May 15, 2011, the alleged onset date. (Tr. 123). At Step Two, the ALJ concluded Plaintiff had the following severe impairments: "bipolar II disorder and insomnia." (Tr. 27). At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 27-29). The ALJ then found that Morris had the residual functional capacity ("RFC") to perform a full range of work, except that Morris requires work that is simple, unskilled and repetitive, with one, two, or three step tasks, with a SVP rating of 1 or 2; occasionally in close proximity to co-workers and supervisors (meaning that the individual can occasionally function as a member of a discrete team); occasionally in direct contact with the public, in a "low stress" environment defined as having only occasional changes in

8

the work setting. (Tr. 29). At Step Four, the ALJ found that Morris was unable to perform his past relevant work as a math tutor. (Tr. 33). At Step Five, the ALJ found that a significant number of jobs existed which Morris could perform despite his limitations. (Tr. 34-35). As a result, the ALJ found Morris not disabled under the Act. (Tr. 35).

## STANDARD OF REVIEW

This Court reviews objections to an R&R on a dispositive motion *de novo*. *See* 28 U.S.C. § 636(b)(1)(c). Judicial review of a decision by an Administrative Law Judge ("ALJ") is limited to determining whether the factual findings are supported by substantial evidence and whether the ALJ employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's factual findings "are conclusive if supported by substantial evidence." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 243 (6th Cir. 1987). "Substantial evidence is defined as more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). The substantial evidence standard "does not permit a selective reading of the record," as the reviewing court's assessment of the evidence supporting the ALJ's findings "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984).

## ANALYSIS

The R&R [16] recommends that the Court deny Plaintiff's Motion for Summary Judgment [12], grant Defendant's Motion for Summary Judgment [13], and affirm the ALJ's decision denying Plaintiff benefits. The R&R reaches this decision by concluding that the ALJ did not err in assessing the weight given to the treating and non-treating physicians' opinions, the ALJ properly considered Morris' credibility, and that the ALJ's RFC assessment was proper.

In his Motion for Summary Judgment [12] Plaintiff argues, *inter alia*, that the ALJ's credibility analysis and residual functional capacity (RFC) analysis was not supported by substantial evidence given that the ALJ failed to analyze the Plaintiff's failure to follow prescribed treatment according to regulations. [Tr. 12 at 14-21]. Regarding the credibility analysis, the R&R admits that Plaintiff is correct about there being a large body of case law that cautions against making negative credibility findings on the basis of non-compliance with treatment regimens where the claimant suffers from a mental disorder. However, the R&R concluded that there was nothing in the record that indicated that Plaintiff's condition itself caused him to avoid treatment, and in fact the record shows that Plaintiff was aware of both the causes and solutions for his conditions and had identified activities that he

could perform that helped alleviate any onset of symptoms. Given these facts from the record, the R&R argues that the lapse in treatment was correctly taken into account by the ALJ as part of a credibility assessment.

The Court disagrees with the ALJ's assessment of Plaintiff's credibility which was based on the lack of treatment caused by Plaintiff. While Social Security Ruling 96-7p states that a claimant's testimony "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure," it also cautions that the ALJ:

> must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. *Titles II & Xvi: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A. July 2, 1996).

The Sixth Circuit cautions Administrative Law Judges and Courts not to view a failure to seek mental health treatment as "probative of whether a mental impairment exists and should not be determinative in a credibility assessment." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 436 (6th Cir. 2013). ALJs are cautioned to closely look to the entire record in cases concerning a lack of

11

treatment for mental disorders because the Courts have recognized that mental health disorders may in fact create symptoms that cause the very failure to seek treatment itself. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009). Therefore, when taking into consideration failure to seek treatment, ALJs are required to consider the evidence in record and see if a "reasonable mind" could find that the lack of treatment was related to the disorder itself or could indicate a possible alleviation of symptoms which should be taken into account in the credibility analysis. *Id*.

While the case law and the Social Security Ruling regarding credibility determinations does not preclude an ALJ from considering a failure to seek mental health treatment in the credibility analysis, it does guide the ALJ to develop the record and seek concrete answers from Claimants regarding a lack of treatment when assessing the credibility of a claim. The Social Security ruling lists examples of sound reasons for noncompliance with treatment that would not affect a claimant's credibility, including that "the individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms," or that Claimant "may not take prescription medication because the side effects are less tolerable than the symptoms." SSR 96-7P.

There is a lack of substantial evidence to support a reasonable mind from discrediting Plaintiff's testimony regarding their mental limitations. In this case, the ALJ mentions in the decision denying disability benefits the lack of treatment from May 2011 through December 2012 in the analysis of the residual functional capacity of the Plaintiff and thus can be interpreted as being a part of the credibility analysis. However, the ALJ did not question the Plaintiff during the hearing on the reason behind this lack of treatment, despite having evidence on the record that could point to noncompliance due to adverse symptoms from his medication as well as a pattern of avoiding certain activities while engaging in hobbies to combat the onset of depressive episodes, both of which are credited by the Social Security ruling as being legitimate reasons for a lack of treatment that would not affect credibility. The ALJ cited hobbies such as ballroom dancing and caregiving for an ill mother as evidence that discredits Plaintiff's testimony about limitations on his ability to work. However, Plaintiff cites these activities on the record as helping to deal with the depression, which is one of the possible explanations for missing treatment that does not reflect negatively on credibility. Plaintiff also has on record evidence that the side effects of the prescribed drugs were causing him to not take them, which is another possible explanation for a lack of treatment that excuses noncompliance. The ALJ erred by not questioning the Plaintiff directly regarding

the reason for the lack of treatment and how his hobbies, caregiver role, and the unwanted side effects from medication contributed to his overall mental health and impacted the treatment regime. This testimony could also impact the consistency of Plaintiff's subjective evidence with their objective medical evidence. Furthermore, a reassessment of Plaintiff's credibility could led to a different RFC assessment given that Plaintiff's credibility analysis could significantly differ after further developing the record.

The case should be remanded so that the ALJ can further develop the record regarding the lack of treatment and reassess the credibility of the total evidence on record to see if there is substantial evidence to support Plaintiff's testimony concerning his limitations on his ability to work.

## CONCLUSION

Plaintiff's Motion for Summary Judgment [12] requests that the Court remand the case for further proceedings. The Court considers that the Plaintiff's record of non-compliance with medical treatment to not have been assessed in a manner compatible with Social Security Regulations as described above. The Court orders that on remand the ALJ should reassess Plaintiff's credibility in a manner that corrects the deficiencies in this Order, including developing the record regarding possible justifications for noncompliance with treatment.

For the reasons stated above, the Court declines to adopt the Report and Recommendation [16]. Therefore,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment [12] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [13] is **DENIED**.

**IT IS FURTHER ORDERED** that the case is **REMANDED** for a reassessment of Plaintiff's credibility and further proceedings consistent with the reassessment.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: November 24, 2015          Senior United States District Judge